UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRANCISCO DURAN,

    Petitioner,

    v.

FERNANDO GONZALES, Warden,

    Respondent.
                                /

No. C 08-4355 SI (pr)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This matter is now before the court for consideration of the merits of Francisco Duran's pro se petition for writ of habeas corpus concerning his conviction in the Santa Clara County Superior Court. For the reasons discussed below, the petition will be denied.

## BACKGROUND

A Santa Clara County jury convicted Duran of committing the following crimes for the benefit of a criminal street gang: attempting to dissuade a witness, by force, from assisting in a prosecution; attempting to dissuade a witness, by force, from testifying; assault with a deadly weapon; and possession of methamphetamine, for sale. See Cal. Penal Code §§ 186.22(b)(4), 136.1(c)(1), 245(a)(2), and Cal. Health & Safety Code § 11378. The trial court sentenced Duran to life imprisonment and a consecutive term of seventeen years.

Duran appealed. The California Court of Appeal affirmed the conviction in a reasoned opinion. The California Supreme Court denied his petition for review. Duran then filed this federal petition for writ of habeas corpus.

The following facts relating to the witness dissuasion counts are taken from the opinion

of the California Court of Appeal.

    Javier "Droopy" Ayala was a member of the Vario Meadow Fair (VMF), which was a Norteno criminal street gang in San Jose. Defendant, who had a tattoo of "Norteno" on his chest and was known as "Gangster," was also a member of VMF. VMF is a sister gang to Vario Norte Catorce (VNC). VMF and VNC cooperated with each other and were enemies of Sureno criminal street gangs. When Javier Ayala was stabbed, members of VMF and VNC retaliated against the Surenos by attacking 15-year-old Christian Jimenez on April 24, 2003. Alexander "Tiny" Diaz, a VNC member, shot Jimenez in the chest and killed him.

....

    Sometime around May 5, 2003, Diaz, Brigena Cartier, Diaz's girlfriend, defendant, and other gang members were at Mary Mendoza's house. When Cartier made a flippant remark about the Nortenos, defendant became very angry, pointed a rifle at her head, and told her to retract her comment. Cartier was scared, because it was obvious defendant was serious.

....

    After his arrest, Diaz gave a statement to the police in which he identified Jesse Salinas, Jonathan Pipkin, Jorge Ayala, and Robert Sanchez as involved in Jimenez's murder. Diaz also spoke with Cartier and told her that he had killed Jimenez. Cartier then told the police that Diaz had said that he shot Jimenez because he was a Sureno and that he left the weapon at Mendoza's house. She also told the police that Javier Ayala had said that Diaz had done him a favor by taking care of Surenos. After giving statements to the police, Cartier was considered to be a witness in the Jimenez case.

    Defendant was in jail on an unrelated matter between July 12, 2003 and July 17, 2003. Around midnight on July 18, 2003, Cartier and her cousin Violet Rosario were walking near a nightclub in downtown San Jose. Defendant called Cartier's name. Cartier, who was concerned for Rosario's safety, told her to remain where she was. Cartier then went to where defendant was standing. Jorge Ayala stood a short distance away from them and acted as a lookout. Defendant, who was very serious and angry, accused Cartier of snitching on him and that Diaz had told him that she was "telling cops a whole bunch of stuff." Cartier denied it and said that "it was his boy that snitched on him first before I even said anything." Cartier was afraid that if Diaz continued to tell "stuff" to defendant, she might be killed. Defendant referred to Diaz as a snitch and stated more than once that he was "going to kill that fool" for implicating him in the Jimenez murder. Cartier told defendant that Diaz had written her a letter that showed that Diaz was the snitch. When a police car drove by, Jorge Ayala gave a signal to defendant and they left by car. Cartier felt that her dispute with defendant was unresolved. Cartier returned to Rosario. She looked sad and scared, and told Rosario that she had been accused of being a snitch and threatened. At trial, Cartier testified that she did not want to be in court and she was concerned for her safety.

    As of July 18, 2003, there was an ongoing police investigation in the Jimenez case as to the uncharged defendants, and the charged defendants in that case were still awaiting prosecution.

    On July 24, 2003, Cartier told the police about the incident when defendant put a gun to her head and told her to retract her comment about the Nortenos. She also told them about the July 18, 2003 incident. She stated that defendant ordered her to come to

2

him, accused her of being a snitch, and blamed both her and Diaz for his recent arrest. Cartier reported that she lied to defendant and denied talking to the police. Defendant said that he would kill Diaz and implied that he was going to kill her as well, because they were a couple. Cartier was afraid, and stated that it was more likely that defendant would kill her than he would kill Diaz. She also stated that Jorge Ayala looked at her in a threatening manner.

Sergeant Byron Jones testified as an expert in Hispanic criminal street gangs. Jones testified that "anyone that provides any information at all to the police is a snitch" and that the "threat hanging over people that cooperate and speak to the police is extremely grave." According to Jones, Cartier had been a reluctant witness, because it was difficult to talk with her about the case and to get her to come to court. Jones also testified that "fool" is a "term of endearment" among gang members, that is, the individual may be considered reckless or violent by society's standards, but is acceptable by gang standards.

Detective Gregory Lombardo also testified as an expert in Hispanic criminal street gangs. He testified about the crimes that VMF and VNC have committed, including assaults, murders, narcotics trafficking, and witness intimidation. According to Lombardo, criminal street gangs thrive by intimidating people and preventing them from cooperating with the police. When an individual speaks to the police or the district attorney's office, they are considered a snitch. This is a very serious offense among gang members, and a snitch "will probably be harmed ... even be killed." In Lombardo's opinion, defendant's pointing the gun at Cartier was done for the benefit of VMF, because it demonstrated the gang's dominance over people who make disparaging remarks about it. This act also increased defendant's stature as a gang leader by showing that he was doing what was necessary to support the gang. Lombardo further opined that defendant's selling of methamphetamine would benefit VMF, because gang members sold drugs to get money to buy more drugs and weapons for gang use. Lombardo also gave his opinion that defendant's threats to Cartier would benefit VMF, because it showed that gang members would hurt or kill potential witnesses against them.

Exh. F at 2-5.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

3

highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A. <u>Sufficiency of the Evidence</u>

Duran contends that there was insufficient evidence to support his convictions for dissuasion of a witness.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>see</u> <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992), <u>cert. denied</u>, 510 U.S. 843 (1993). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. <u>See</u> <u>Jackson</u>, 443 U.S. at 324; <u>Payne</u>, 982 F.2d at 338.[1] Under § 2254(d), a federal habeas court applies the standards of <u>Jackson</u> with an additional layer of deference. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005), <u>cert. denied</u>, 546 U.S. 1137 (2006). Generally, a federal habeas court must ask whether the state court decision reflected an unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case. <u>Id.</u> at 1275 (quoting 28 U.S.C. § 2254(d)).

The California Court of Appeal's decision was not contrary to or an unreasonable application of <u>Jackson</u> and <u>Winship</u>. The state appellate court correctly identified the controlling legal principle. And that court also reasonably applied the controlling legal principle to Duran's

---

[1] Petitioner argues that a heightened standard of review applies when a conviction punishes speech. Petitioner cites <u>Harte-Hanks Communications, Inc. v. Connaughton</u>, 491 U.S. 657, 688-89 (1989) as requiring the court to review the evidence independently. Unlike <u>Harte-Hanks Communications</u>, this case involves criminal threats and the court is reviewing for habeas relief. <u>Id.</u> "True threats" fall outside the protection of the First Amendment. <u>United States v. Cassel</u>, 408 F.3d 622, 627 (9th Cir. 2005). Thus, as with any other insufficiency claim for a criminal conviction on habeas review, this court will apply the <u>Jackson</u> standard. However, even if a heightened standard were required, that standard has been met as well, as explained in the decision of the California Court of Appeal.

5

case as follows:

> Under either the substantial evidence or the independent review standard, we conclude that there was sufficient evidence to support defendant's convictions. Defendant's fellow gang member, Diaz, was in jail for murdering a Sureno gang member. Defendant had heard that Cartier, Diaz's girlfriend, was providing information about defendant to the police. When defendant saw Cartier on a street in downtown San Jose late at night, he ordered her to come to him. Defendant then called both Diaz and Cartier snitches while a fellow VMF gang member stood watch. Defendant was very serious and angry, and stated more than once that he would "kill that fool." The fact that defendant did not display any physical violence is irrelevant, because a snitch "will probably be harmed ... even be killed" in the gang community. Defendant expressly threatened to kill Diaz and implied that he would kill Cartier as well, because they were a couple and he blamed both of them for implicating him in Jimenez's murder. Defendant's threats left Cartier concerned for her safety and a reluctant witness at trial. Thus, a rational trier of fact could have found defendant guilty beyond a reasonable doubt of counts 1 and 2.

Exh. F at 7-8.

### 1. Count One: Dissuasion of a Witness – Bridgena Cartier

Duran was convicted of attempting to dissuade Bridgena Cartier, by force, from assisting in a prosecution. This crime occurred if (1) Duran maliciously tried to discourage Cartier from cooperating or providing information so that a complaint or indictment could be sought and prosecuted, and assisting in the prosecution thereof, (2) Cartier was a witness, (3) Duran knew that he was trying to discourage Cartier from assisting in a prosecution, and intended to do so, and (4) Duran threatened to use force or violence on Cartier or any other person. See Cal. Penal Code § 136.1(b)(2) and (c)(1); Judicial Council of California, Judicial Council of California Criminal Jury Instruction ("CALCRIM") §§ 2622, 2623 (Matthew Bender & Co., Inc. 2009) ("CALCRIM"). In the witness dissuasion context, "malice" means "an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." Cal. Penal Code § 136(1). Cartier was a witness if she had "knowledge of the existence or nonexistence of facts relating to any crime." See Cal. Penal Code § 136(2).

Duran argues that insufficient evidence was produced that he had the malice required by Penal Code section 136.1. Exh. C at 12. However, evidence was produced that showed the following: Duran called Cartier toward him, stood very close to her, and angrily told her that she

was a snitch. Cartier responded that Diaz was the real snitch. Duran then threatened to kill Diaz. RT 129, 134. Cartier was scared for her life and also thought Diaz was going to be killed. RT 134-37. There was testimony that when someone is perceived as a snitch in the gang context, gang members will probably harm or kill that person. RT 1519-20. Based on this evidence, a reasonable jury could have concluded that Duran knowingly confronted Cartier with the intent to discourage Cartier from assisting in the Jimenez murder prosecution and therefore interfere with the orderly administration of justice.

Duran argues that his words to Cartier lacked malice because they were not spoken with a gravity of purpose or likelihood of execution. Exh. C at 18. This argument fails because Duran produced no evidence at trial that would tend to show that his threat wasn't spoken with malice. To the contrary, evidence was produced at trial that on a recent prior occasion Duran had pointed a gun at Cartier because he thought she was disloyal to his gang. RT 123, 126-27. Based on this past conduct, Duran's gang affiliation, and Cartier's testimony that Duran angrily called her a snitch, a jury reasonably could have concluded that Duran's threats were spoken with a gravity of purpose indicative of malice.

The jury reasonably concluded that Cartier was a witness based on Sergeant Jones' testimony that Cartier had been cooperating with police and giving statements in regards to the Jimenez murder. RT 76. Even though Duran only threatened to kill Diaz directly, Cartier testified that her life was in danger too since she and Diaz were a couple and because Duran thought she was a snitch as well. RT 134, 136. Based on the evidence that Duran called Cartier a snitch, confronted her angrily, and said he was going to kill her boyfriend, the jury could have reasonably concluded that Duran "expressly threatened to kill Diaz and implied that he would kill Cartier as well." Exh. F at 8.

Because a rational jury could have found every element of dissuasion of a witness proven beyond a reasonable doubt, the state court's finding that there was sufficient evidence was neither contrary to nor an unreasonable application of federal law.

### 2. Count Two: Dissuasion of a Witness, Alexander Diaz

Duran was convicted of attempting to dissuade Alexander Diaz, by force, from testifying. This crime occurred if (1) Duran maliciously tried to discourage Diaz from giving testimony, (2) Diaz was a witness, (3) Duran knew he was trying to discourage Diaz from testifying, and (4) Duran used threat of violence against Diaz. See Cal. Penal Code § 136.1(a)(2) and (c)(1); CALCRIM 2622. Alexander Diaz was a witness if he had "knowledge of the existence or nonexistence of facts relating to any crime." See Cal. Penal Code § 136(2).

As with count one, Duran argues that insufficient evidence was produced that he had the malice required by Penal Code section 136.1. Exh. C at 12. At trial, evidence was produced that Duran told Cartier multiple times and in an angry voice that Diaz was a snitch and Duran was going to kill Diaz. RT 134. Evidence was produced that Duran knew that Cartier was Diaz's girlfriend, and from which it could be inferred that sending a message by way of Cartier would be an effective way to communicate a threat to Diaz. RT 134, 320-21. There was testimony that someone perceived as a snitch in the gang context probably will be harmed or killed. RT 1519-20. Based on this evidence, a reasonable jury could have concluded that Duran knowingly spoke to Cartier with the intent to vex or harm Diaz and interfere with the orderly administration of justice. Therefore, the jury could have inferred that Duran maliciously sought to dissuade Diaz.[2]

Duran argues that he would not have knowingly dissuaded Diaz from testifying against him regarding the Jimenez murder because Duran had been in jail at the time of the murder and therefore knew that he could not be implicated in the murder. Exh. C at 21-22. However, evidence was produced that Duran knew that Diaz had implicated many gang associates in the planning of the murder. The jury could have reasonably concluded that Duran knowingly tried to dissuade Diaz from implicating him or continuing to implicate other gang members in the planning of the Jimenez murder.

The jury reasonably could conclude that Diaz was a witness based on the evidence that

---

[2] Although Diaz was convicted on two counts, the sentence as to count two was stayed because they "arose out of an indivisible course of conduct with a single objective." Exh. F at 18.

8

Diaz had implicated himself as well as other gang members in the Jimenez murder. Based on the evidence that Duran said he was going to kill Diaz, the jury could have reasonably concluded that Duran threatened to use violence against Diaz.

Because a rational jury could have found every element of count two, dissuasion of a witness, to be true beyond a reasonable doubt, the state court's finding that there was sufficient evidence was neither contrary to nor an unreasonable application of federal law.

B.  Jury Instructions

Duran contends that the jury instructions violated his due process rights because they allowed the jury to convict without finding proof beyond a reasonable doubt. Exh. C at 27, 35. Specifically, he argues that CALJIC 7.15 incorrectly stated the law, that the modified CALJIC 7.15 impermissibly bundled together two offenses, and that CALJIC 2.02 erroneously instructed the jury regarding circumstantial evidence of specific intent. Exh. C at 28, 31, 36.

To obtain relief for errors in a jury charge, a petitioner must show that the error by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). The instruction must not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. In order to show a due process violation, a petitioner must show both ambiguity or error and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009). However, a determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. Calderon v. Coleman, 525 U.S. 141, 146 (1998). The court must also determine that the error had a substantial and injurious effect or influence in determining the jury's verdict to grant habeas relief. Id. at 146-47.

1.     CALJIC 7.15: Statement of the Law

Duran argues that the use of CALJIC 7.15 led to an erroneous statement of the law because the language of CALJIC 7.15 allows the jury to convict based upon the acts of "another person." Exh. C at 29-30. The trial court instructed the jury:

> [E]ach of the following elements must be proved: One, Bridgena C. and/or Francisco (sic) Diaz was a victim; two, another person with the specific intent to do so prevented or dissuaded or attempted to prevent or dissuade the above-named people from attending or giving testimony at any trial, proceeding or inquiry authorized by law, making a report to any peace officer, causing a complaint, indictment or information to be sought and prosecuted, and from assisting in the prosecution thereof.

CT 297; CALJIC 7.15. Duran argues that the second prong of the instruction fails to instruct the jury that it must find <u>the defendant</u> with the specific intent to dissuade the witness, because it allows the jury to merely find that <u>another person</u> intended to dissuade the witness. Exh. C at 29.

The California Court of Appeal rejected Duran's argument as follows:

> Here the trial court read the information to the jury. It alleged that "Francisco Duran" committed counts 1 and 2. The trial court then instructed the jury pursuant to CALJIC No. 7.15 that "defendant [was] accused in Counts 1 and 2 of having violated Section 136.1 Subdivision (c)(1)." We presume that jurors are intelligent people who are capable of understanding and correlating all instructions. (People v. Tatman (1993) 20 Cal.App.4th 1, 11.) Since they were instructed to consider the various instructions "as a whole and each in light of all the others," they would have understood that the subsequent reference in CALJIC No. 7.15 to "another person" was to defendant.

Exh. F at 10.

Duran's argument takes the instruction out of the context of the instructions as a whole. At the beginning of the CALJIC 7.15 instruction, the court instructed the jury that "Defendant [was] accused in counts one and two of having violated section 136.1 subdivision (c)(1)." CT 297. The court also read the charging information to the jury as part of the jury instructions, which alleged that Francisco Duran attempted to dissuade Bridgena Cartier and Alexander Diaz. CT 290-91. When the instruction is placed within the context of these other instructions, it is apparent that "another person" refers not to an unnamed third person, but to Duran. Thus, Duran has failed to show a reasonable likelihood that the jury convicted him based upon the acts of anyone other than Duran.

10

The California Court of Appeal correctly identified the controlling legal principle and reasonably applied the controlling legal principle to Duran's case. Because the instruction referred to Duran when read in the context of the instructions as a whole, the state court's rejection of the claim was neither contrary to nor an unreasonable application of Estelle and Waddington.

2.  CALJIC 7.15: Bundling of Offenses

Duran argues that reading CALJIC 7.15 in reference to both counts one and two at the same time impermissibly bundled together two separate offenses involving two separate victims, and as a result, failed to inform the jury as to which manner of violating section 136.1 applied to which victim. Exh. C at 31. Duran argues that the instruction permitted the jury to find him guilty on both counts without agreeing as to whether the prosecution actually proved the corresponding elements of each separate offense. Exh. C at 32.

The California Court of Appeals rejected Duran's claim as follows:

> Here the information, which was read to the jury, identified how defendant violated section 136.1 as to each individual. Count 1 of the information alleged that defendant attempted to dissuade victim Cartier from cooperating with the investigation and prosecution, while count 2 alleged that defendant attempted to dissuade witness Diaz from giving testimony. Thus, the jury was informed that defendant was alleged to have violated subdivision (a) as to Cartier and subdivision (b) as to Diaz (sic). The verdict forms stated that defendant had been found guilty of violating section 136.1, subdivision (c) as charged in counts 1 and 2. Any confusion generated by CALJIC No. 7.15 was eliminated by the verdict forms and the information, because, when read together, the jury identified which manner of violating section 136.1 applied to which victim. Accordingly, even if we apply the federal harmless error standard, any error was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24.)

Exh. F at 11.

Again, Duran's argument takes this instruction out of the context of the jury instructions as a whole. The jury heard the information which clearly accused Duran in count one of attempting to "prevent and dissuade a witness and victim, Bridgena C., from causing a complaint, indictment, information, probation, and parole violation to be sought and prosecuted and from assisting in the prosecution thereof," and in count two of attempting to "prevent and dissuade a witness and victim, Alexander Diaz, from attending and giving testimony at a trial, proceeding

11

and inquiry authorized by law." CT 290-91. In this context, the jury was informed fully as to which elements applied to which charge. Furthermore, the verdict forms plainly show that the jury found Duran guilty of two separate counts of dissuading a witness. CT 327-28. Duran has failed to show a reasonable likelihood that the jury applied the instruction without unanimously finding each element for each count proven beyond a reasonable doubt.

The California Court of Appeal correctly identified the controlling legal principle and reasonably applied the controlling legal principle to Duran's case. Because the jury instructions correctly explained which elements were required for which offense when read as a whole, the state court's rejection of the claim was neither contrary to nor an unreasonable application of <u>Estelle</u> and <u>Waddington</u>.

### 3. CALJIC 2.02: Circumstantial Evidence of Specific Intent

Duran argues that CALJIC 2.02 lightened the prosecution's burden of proving appellant's specific intent beyond a reasonable doubt because it erroneously instructed the jury regarding circumstantial evidence of specific intent.[3] Exh. C at 35.

After instructing the jury that circumstantial evidence is an acceptable form of proof, the trial court instructed the jury pursuant to CALJIC 2.01, which addresses "Sufficiency of Circumstantial Evidence - Generally," as follows:

> However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime; but two, cannot be reconciled with any other rational conclusion. Further, each fact essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which the inference necessarily rests must be proved beyond a reasonable doubt.
>
> Also, if the circumstantial evidence as to any particular count permits two

---

[3]In Duran's federal habeas petition, he does not address CALJIC 2.02 directly. Rather, he states that "CALJIC No. 7.15 lightened the prosecutors burden of proving Defendant had the requisite specific intent beyond a reasonable doubt with respect to each victim." Because this argument better applies to CALJIC 2.02 than CALJIC 7.15 and because Duran argued on appeal that CALJIC 2.02 lightened the prosecutor's burden of proving he had the requisite specific intent, this court understands Duran's federal habeas petition as intending to challenge the specific intent instruction of CALJIC 2.02.

> reasonable [ ] interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence and reject the interpretation that points to his guilt.
>
> If, on the other hand, one of the interpretations appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

CT 266. The trial court also instructed the jury pursuant to CALJIC 2.02, which addresses "Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State" as follows:

> The specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of the crimes charged in Counts 1, 2 and 4 or the lesser crimes to Counts 1 and 2 or find the allegations concerning gangs to be true unless the proved circumstances are not only, one, consistent with the theory that the defendant had the required specific intent but two, cannot be reconciled with any other rational conclusion.
>
> Also, if the evidence as to any specific intent permits two reasonable interpretations, one of which points to the existence of the specific intent and the other to its absence, you must adopt that interpretation which points to its absence. On the other hand, if one interpretation of the evidence as to the specific intent appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

CT 295. Duran points out that CALJIC 2.01 and CALJIC 2.02 mirror one another except that CALJIC 2.02 omits the following passage:

> Further, each fact essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which the inference necessarily rests must be proved beyond a reasonable doubt.

Exh. C at 37. Duran argues that as a result, the jury was not instructed that the circumstances underlying an inference of specific intent need to be proved beyond a reasonable doubt. The California Court of Appeal dealt with Duran's claim as follows:

> As previously discussed, the absence of a critical element in one instruction may be supplied by another instruction or cured by the instructions as a whole. (People v. Smithey (1999) 20 Cal.4th 936, 963-964.) When CALJIC Nos. 2.01 and 2.02 are read in conjunction with the reasonable doubt instructions (CALJIC Nos. 2.90, 2.91), the jurors in the instant case would have understood that in order to find defendant guilty in counts 1, 2 and 4, they were required to find under the reasonable doubt standard that defendant had the specific intent to commit the charged offenses. (See People v. Bradford (1997) 14 Cal.4th 1005, 1054.) We find no error.

Exh. F at 13.

As the state appellate court noted, CALJIC 2.02 must be considered in the context of the instructions as a whole. The jury was instructed as to the general reasonable doubt standards pursuant to CALJIC 2.90 and 2.91. CT 288-89. Furthermore, the fact that CALJIC 2.02 was read in addition to CALJIC 2.01, which instructed the jury that they must find every circumstance underlying their findings to be true beyond a reasonable doubt, would have communicated to the jury that the circumstances underlying their finding of specific intent must also be found beyond a reasonable doubt. Duran has not shown a reasonable likelihood that the jury failed to understand this requirement.

The California Court of Appeal correctly identified the controlling legal principle and reasonably applied the controlling legal principle to Duran's case. Because the jury instructions correctly instructed the jury on the reasonable doubt standard when read as a whole, the state court's rejection of the claim was neither contrary to nor an unreasonable application of Estelle and Waddington.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: September 28, 2009

                                                  SUSAN ILLSTON
                                        United States District Judge